John E. KIERONSKI,
Plaintiff-Appellant,

v.

WYANDOTTE TERMINAL RAILROAD,
CO., Defendant-Appellee.

No. 85–1685.

United States Court of Appeals,
Sixth Circuit.

Argued July 22, 1986.

Decided Dec. 2, 1986.

Rehearing and Rehearing En Banc
Denied Jan. 19, 1987.

Mikael G. Hahner, Harvey M. Howitt, Bernstein & Bernstein, P.C., Detroit, Mich., Michael Cantor, argued, for plaintiff-appellant.

T. Patrick Durkin, Durkin, McDonnell & Clifton, Detroit, Mich., Joseph McDonnell, argued, for defendant-appellee.

Before LIVELY, Chief Judge, and KENNEDY and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

Plaintiff-Appellant, John E. Kieronski, was injured during the course of his employment with Defendant-Appellee, Wyandotte Terminal Railroad Company ("Wyandotte"). Kieronski subsequently sued Wyandotte in federal district court for compensation under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 ("FELA"). At a pre-trial conference, the district court ordered the parties to brief several issues, including whether Wyandotte was a "common carrier" within the meaning of the FELA (the FELA applies only to common carriers by railroad). After reviewing the parties' briefs and memoranda, and after having additional discussions with counsel for both parties, the district court, *sua sponte*, dismissed the action, concluding that Wyandotte was not a "common carrier" within the meaning of the FELA. Kieronski appeals to this Court from that

dismissal. For the reasons set forth below, we affirm.

Wyandotte was, at the time of Kieronski's injury, a wholly-owned subsidiary of BASF Wyandotte Corporation ("BASF"). Originally, Wyandotte's railroad line was on two parcels of property owned by BASF, and its operations were almost entirely concerned with in-plant switching for BASF. At one parcel, Wyandotte's tracks connected to and Wyandotte received cars from the Detroit, Toledo & Ironton Railroad. At the other parcel, Wyandotte's tracks connected to and Wyandotte received cars from Consolidated Rail Corporation. Wyandotte also had trackage rights over a short stretch of track owned by the Detroit, Toledo & Ironton Railroad, so that it could travel between the two parcels of land to perform switching duties at both locations. BASF subsequently sold portions of its property to Diversey Wyandotte Corporation and to Du Pont Carbide. As a part of the purchase agreement, BASF arranged to have Wyandotte switch the purchasers' rail cars as well as those of BASF.

■ The sole issue on appeal is whether the district court erred in concluding that Wyandotte is not a "common carrier" within the meaning of the FELA. A railroad may be liable, under the FELA, for on-the-job injuries sustained by employees, and it is undisputed that Wyandotte conducts railroad operations; however, liability under the FELA is expressly limited to railroads that are also *common carriers*. Specifically, the FELA provides, in relevant part, that—

> [e]very common carrier by railroad while engaging in [interstate] commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce....

45 U.S.C. § 51. A common carrier has been defined as—

> one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carri-

er is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant. *Kelly v. General Electric Co.*, 110 F.Supp. 4, 6 (E.D.Pa.), *aff'd*, 204 F.2d 692 (3d Cir.), *cert. denied*, 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390 (1953).

The district court below relied on *Lone Star Steel Co. v. McGee*, 380 F.2d 640 (5th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), in determining that Wyandotte was not a "common carrier," and described *Lone Star* as setting forth a "four-part test" to be used in determining whether a particular rail facility is a "common carrier by railroad," that is—

> First—actual performance of rail service, second—the service being performed is part of the total rail service contracted for by a member of the public, third—the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth—rumuneration [sic] for the services performed is received in some manner, such as a fixed charged from a railroad or by a percent of the profits from a railroad.

380 F.2d at 647. The district court then concluded that Wyandotte was not a "common carrier by railroad," because Wyandotte did not fulfill the third criterion of the "test."

This Court agrees with the district court's conclusion that Wyandotte is not a "common carrier," but we do not rely directly upon (or resort to) the *Lone Star* test. A close reading of the language of *Lone Star* reveals that the list cited above is a list of "various considerations" that the Fifth Circuit thought were of "prime importance" in determining whether an entity was a "common carrier." 380 F.2d at 647. We do not believe that the list of considerations should be applied as a *test* because it is, as the *Lone Star* court characterized it, only a list of *considerations* for a court to keep in mind when determining whether a carrier is a "common carrier." Our review of the numerous cases determining when a

carrier is a "common carrier" reveals that carriers can be divided into several categories.[1] We believe that it is more helpful here to focus on the several categories than it is to apply the considerations of *Lone Star* as a "four-part test."

◼ The first category we see is that of in-plant facilities. Courts have long recognized that in-plant rail facilities are not common carriers, even where those facilities are quite extensive, *see Kelly v. General Electric Co., supra; Duffy v. Armco Steel Corp.*, 225 F.Supp. 737 (W.D.Pa. 1964), and an in-plant system does not become a common carrier merely by being connected to a common-carrier, because such a connection is a common feature of in-plant systems. *See Kelly v. General Electric Co.*, 110 F.Supp. at 8.

◼ Another category of carriers that are not considered to be "common carriers," is that of private carriers. *See, e.g., Ward Transp. Inc. v. Public Utilities Comm'n*, 151 Colo. 76, 376 P.2d 166, 169 (1962) (trucking company); *Dawkins Lumber Co. v. L. Carpenter & Co.*, 213 Ky. 795, 281 S.W. 1013 (1926); *State ex rel. Silver Lake Ry. & Lumber Co. v. Public Serv. Comm'n*, 117 Wash. 453, 201 P. 765 (1921). Private carriers haul for others, but only pursuant to individual contracts, entered into separately with each customer.

◼ A type of carrier that is invariably labelled a "common carrier" is a linking carrier. Where a rail entity links two or more common carriers, the linking entity has become a vital part of the common carrier system and, therefore, becomes a common carrier. *See, e.g., United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936) (linked wharf and common carrier railroads); *United States v. Brooklyn Eastern Dist. Terminal*, 249 U.S. 296, 39 S.Ct. 383, 63 L.Ed. 613 (1919) (linked docks and common carrier railroad); *United States v. Union Stock Yard & Transit Co.*, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912) (linked common carrier railroads); *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (linked docks and common carrier railroads); *Fort Street Union Depot Co. v. Hillen*, 119 F.2d 307 (6th Cir.), *cert. denied*, 314 U.S. 642, 62 S.Ct. 82, 86 L.Ed. 515 (1941) (linked common carrier railroads); *Union Stockyards Co. v. United States*, 169 F. 404 (8th Cir.1909) (linked common carrier railroads). This is true where there is common ownership between the linking carrier and a linked common carrier, *see, e.g., United States v. Union Stock Yard & Transit Co., supra; Southern Pac. Terminal Co. v. ICC, supra*, or where the relationship is purely contractual. *See, e.g., United States v. Brooklyn Eastern Dist. Terminal, supra; United States v. California, supra; Fort Street Union Depot Co. v. Hillen, supra; Union Stockyards Co. v. United States, supra.*

Finally, there is the category in which we find *Lone Star*. Lone Star looks initially like a typical in-plant operation, which would not be characterized as a "common carrier," except that Lone Star's operation did not end there. Lone Star also performed some of the functions of the common carrier, functions that the common carrier's customer had contracted to have the common carrier perform. Lone Star became, in effect, part of the common carrier by virtue of Lone Star's ownership of the common carrier, combined with Lone Star's performance of the common carrier's duties. Several of the "linking" cases cited above may also fit into this category. *See, e.g., United States v. Brooklyn Eastern Dist. Terminal, supra; United States v. California, supra; Southern Pac. Terminal Co. v. ICC, supra.*

◼ In the instant case, Wyandotte argues that it was an in-plant system. We agree. Wyandotte's system connected to two common carriers, but in no way acted to "link" them or to perform functions for which the customers of the common carriers had contracted. Wyandotte merely connected the plants to the common carriers in a manner typical of in-plant systems. Our conclusion is not weakened by Wyandotte's right to use a portion of the track of the Detroit, Toledo & Ironton Railroad, a common carrier, because those rights were

---

**1.** Our selection of categories is not necessarily exhaustive.

merely for the convenience of the plants and in no way furthered the contractual obligations of the common carrier. *See Duffy v. Armco Steel Co., supra* (fact that carrier had leased right to travel over common carrier's right-of-way did not lead court to characterize carrier as "common carrier"). Similarly, our conclusion is not weakened by the fact that Wyandotte was, at the time of the injury, also servicing the facilities of Diversey Wyandotte Corporation and Du Pont Carbide. Those extensions of service did not go beyond what was originally BASF property; Wyandotte retained its essential character as an in-plant system; and Wyandotte did not provide services that the common carrier had contracted to perform. The system looks, at most, like a private carrier arrangement, with Wyandotte holding itself out solely to those businesses that owned facilities within the original two parcels, which does not lead us to characterize Wyandotte as a "common carrier."

Accordingly, the district court's order of dismissal is AFFIRMED.

LIVELY, Chief Judge, dissenting.

I respectfully dissent because I believe the dismissal was premature. The plaintiff had completed his medical proof, but had not had the opportunity to address fully the issue of jurisdiction. Full discovery might well have developed a record that supported FELA jurisdiction.

The majority concludes that the district court arrived at the right answer, but for the wrong reasons. The district court found that the defendant is not a common carrier because it does not satisfy the third prong of the *Lone Star* formula, that is, that Wyandotte is not "performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence ... is [not] deemed to be holding itself out to the public...." 380 F.2d at 647. Rejecting this reasoning, the majority concludes that Wyandotte is an "in-plant system." This may be the ultimate conclusion after the facts are developed, but the conclusion is not clear at this point.

The plaintiff filed an affidavit in which he described the movement of railroad cars containing various substances from the interchange tracks of the admitted common carriers (D.T. & I. and Conrail) to the plants of Diversey Wyandotte Corporation and the Du Pont Carbide plant. The movements were performed by employees of Wyandotte operating Wyandotte equipment. Kieronski described his duty of completing switching cards following such switching and transferring operations and further stated, under oath:

I was informed by the yardmaster for Wyandotte Terminal Railroad Company that these switching cards were used by the Wyandotte Terminal Railroad Company to bill Wyandotte Diversy [sic] Corporation and Dupont Carbide for the rail services that we had provided for them.

The yardmaster also informed me that this was one method Wyandotte Terminal Railway Company's financing its day to day operations and that it was very important that we fill out the switching cards because they were the only record we had of performing railroad work for another company.

The plaintiff also filed as an exhibit with his pretrial brief a copy of Wyandotte's petition for authority to be exempted from certain ICC requirements of formality and a summary application to abandon all of its railroad lines. This petition and application were filed pursuant to 49 U.S.C. § 10505 (1982). The exemption provisions of § 10505 refer to matters "related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter...." The definitions applicable to the subchapter are contained in § 10102. In § 10102(4) "common carrier" is defined as "an express carrier, a pipeline carrier, *a rail carrier,* a motor common carrier, a water common carrier, and a freight forwarder." (Emphasis supplied). In § 10102(19) "rail carrier" is defined as "a person providing railroad transportation for compensation."

There appears to be no dispute that Wyandotte performs rail transportation for compensation in switching and moving cars

destined for Diversey Wyandotte and Du Pont Carbide. Thus it comes within the definition of a "rail carrier," which, in turn, is within the definition of a common carrier.

Given the concern repeatedly expressed by Congress and the courts that railroad employees be compensated for work-related injuries under the liberal rules of the FELA rather than the more restrictive rules of general tort law, I believe it was error for the district court to dismiss this action *sua sponte* at the pretrial stage. I would vacate the judgment of the district court and remand for further proceedings.