**James E. MACK, Plaintiff,**

v.

**EAST CAMDEN & HIGHLAND RAILROAD COMPANY, a corporation, a subsidiary of Highland Industrial Park, a corporation, Defendant.**

**No. 01–0325–T.**

United States District Court,
W.D. Tennessee,
Eastern Division.

Dec. 10, 2003.

Lewis L. Cobb, Jr., Esq., Lisa A. Houston, Spragins Barnett Cobb & Butler, Jackson, TN, Robert W. Schmeider, Pratt & Tobin, PC, East Alton, IL, for plaintiff.

Floyd S. Flippin, Esq., Adams Ryal & Flippin, Humboldt, TN, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TODD, District Judge.

Plaintiff James E. Mack, has filed this action pursuant to the Federal Employers Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA"), for personal injuries that he allegedly received during his employment with East Camden & Highland Railroad Company ("East Camden"). Defendant has filed a motion for summary judgment. Plaintiff has responded to the motion, and Defendant has filed a reply to the re-

sponse. For the reasons set forth below, Defendant's motion is GRANTED.

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. To prevail on a motion for summary judgment, the moving party has the burden of showing the "absence of a genuine issue of material fact as to an essential element of the nonmovant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). The moving party may support the motion with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon the pleadings but, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

"If the defendant ... moves for summary judgment ... based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Rather, "[t]he inquiry on a summary judgment motion ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Street*, 886 F.2d at 1479

(quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

On October 23, 1999, Plaintiff was injured while employed by East Camden. The injury occurred at the Milan Army Ammunition Plant. On November 2, 2001, Plaintiff filed a complaint in this court seeking to recover under FELA. In its answer, Defendant raised the defense that it is not subject to FELA because it is not a common carrier. The sole issue presented in the present motion is whether Defendant is a common carrier. If it is not, then Defendant's motion must be granted, and the action dismissed.

In support of its motion, Defendant relies on the following facts which were testified to by David Simpson, Defendant's regional vice president, during his deposition.[1] Defendant has an exclusive contract with American Ordinance Companies, the operator of the Milan Army Ammunition Plant. Defendant does switching of railcars for American Ordinance at the Milan facility and uses the balance of the facility for storage of railcars. Depo. at p. 8. Car storage is Defendant's main business. *Id.* at p. 10.

Defendant owns no rail track in Tennessee and does not maintain any track in Tennessee. *Id.* at pp. 15, 17. American Ordinance maintains the track at the Milan Army Ammunition Plant, and the track is owned by the United States Army. *Id.* at pp. 17, 46.

CSX Railroad ("CSX") and West Tennessee Railroad ("West Tennessee") serve American Ordinance at the Milan facility.

---

1. The parties do not appear to dispute the opposing party's facts but, rather, the legal consequence to be given to the facts.

Both CSX and West Tennessee have D-rails which prohibit Defendant from ever reaching or entering the main line of CSX or West Tennessee. *Id.* at pp. 34, 43, 45, 49. CSX and West Tennessee deliver and pick up cars at the Milan facility by throwing the D-rail switch and pushing or pulling the cars in and off the main line. *Id.* at pp. 43, 49. It is impossible for Defendant to get past the D-rails because they do not have a key to the D-rails. *Id.* at p. 44.

CSX and West Tennessee deliver all cars to Defendant and put the cars on the Government track. Defendant then takes the cars inside the Milan Army Ammunition Plant on the Government track. *Id.* at pp. 44–45. Defendant does not have any customers that it performs work for at the Milan facility other than American Ordinance. *Id.* at p. 8. Defendant's engineers at the Milan facility are Federal Railroad Administration ("FRA") certified because of a contractual requirement with American Ordinance.

In response, Plaintiff has pointed to these facts. Defendant does switching operations at facilities in four different states: Tennessee, Iowa, Louisiana, and Arkansas. *Id.* at p. 9.

In addition to qualifying its engineers to meet FRA standards, Defendant contributes to railroad retirement benefits and railroad unemployment insurance and reports any injury or property damage to the FRA. Defendant's Answers to Interrogatories, 15–17. Defendant withheld from Plaintiff's paychecks railroad retirement taxes and federal unemployment taxes, and the Railroad Retirement Board determined that Plaintiff was entitled to railroad unemployment benefits.[2]

An Internet web site describes Defendant's operations and lists certain customers for its Arkansas site.[3] Plaintiff's Exhibit 2. At its Arkansas site, Defendant owns 47.62 miles of track, has five or six employees in train service, has four to five people maintaining the track, has eleven employees at the Highland Industrial Park, has twenty-eight pieces of equipment for track maintenance, and has approximately twenty-three customers for whom it stores railroad cars. Plaintiff's Exhibits 3 and 4. At its Iowa site, Defendant maintains the track and has thirteen railroad employees, four locomotives, and a tie inserter to service the track.[4] *Id.* At its Louisiana track, Defendant has six employees to maintain the track and three locomotives, in addition to its other railroad equipment. *Id.* At its Tennessee site, Defendant has six employees qualified under FRA rules. *Id.*

Attached to Defendant's reply is the affidavit of its president, Gene Hill. The Internet web site submitted by Plaintiff as an exhibit belongs to the Union Pacific Railroad, and not Defendant. Defendant's own web site advertises for car storage business only. Defendant does not solicit common carrier business from the general public and does not have the capability to service such business. Defendant does not own any track at its Milan, Tennessee, facility. Defendant does not arrange for nor is it responsible for the transportation

---

**2.** Plaintiff has not supported these facts with citations to the record. However, consideration of these facts has not affected the court's decision.

**3.** The parties dispute the significance of this fact, as discussed below.

**4.** Plaintiff's response relies on the deposition testimony of David Simpson for the statement that Defendant owns the track at its Iowa site. Response at p. 8, para. 3. However, Mr. Simpson stated in his deposition that Defendant does not own the track but does maintain it. Plaintiff's Exhibit 4 at p. 16.

of its customers' cars to or from the storage facility. Defendant owns one track at its Arkansas location. This track is used only to ferry cars to and from the Union Pacific line for storage in the car storage facility. No freight is normally carried in these cars. Defendant has the capability to deliver cars to various warehouses located within the industrial park, but none of the tenants of the park use this service. Hill Affidavit.

According to Plaintiff, Defendant should be found to be a common carrier under FELA because (1) it holds itself out to the public as a railroad; (2) it has rail operations in Iowa, Arkansas, Tennessee, and Louisiana; (3) it owns rail track in Arkansas; (4) it does maintenance work on tracks in Iowa and Arkansas and on track owned by others in Tennessee and Louisiana; (5) all railroad accidents and injuries are reported to the FRA; (6) railroad retirement and unemployment premiums are deducted from the payroll; (7) it stores railroad cards for various customers at four different locations for a profit; (8) it has a dispatcher and does switching operations at its various facilities; and (9) it performs TOFC service[5] from a connection with the Union Pacific Railroad Company.

FELA "imposes broad liability on railroads to provide compensation for on-the-job injuries sustained by their employees, but its application is explicitly limited to railroads that function as common carriers." *Iverson v. Southern Minnesota Beet Sugar Cooperative*, 62 F.3d 259, 261 (6th Cir.1995) (citing *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (1943)). Section 1 of

FELA provides that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. Not every railroad is a common carrier within the meaning of FELA. *Mickler v. Nimishillen and Tuscarawas Railway Co.*, 13 F.3d 184, 187 (6th Cir.1993). Accordingly, the assumption that a railroad is a common carriers at all times and for all purposes is incorrect. The question is "not whether defendant is licensed as a common carrier but whether defendant offers or provides common carrier services." *Id.* at 187. The term "common carrier by railroad" encompasses only those railroad companies which are acting as common carriers. *Sullivan v. Scoular Grain Co. of Utah*, 930 F.2d 798 (10th Cir.1991) (citing *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920)). When a railroad does not act as a common carrier, the railroad cannot be treated as one under FELA.

> Persons seeking to recover damages under FELA must establish four points. First, they must establish that the defendant is a common carrier by railroad engaged in interstate commerce; second, they must prove that they were employed by the defendant and assigned to perform duties which furthered such commerce; third, they must demonstrate that their injuries were sustained while they were employed by the common carrier; and finally, they must prove that their injuries resulted from the defendant's negligence.

---

**5.** Railroads, motor carriers, and freight forwarders typically offer both trailer-on-flatcar ("TOFC") and container-on-flatcar ("COFC") services which are "forms of mixed train and truck transportation whereby loaded truck trailers or containers to be placed on truck trailers are transported on railroad flatcars and then hauled by trucks on the highway." *I.C.C. v. Texas*, 479 U.S. 450, 107 S.Ct. 787, 789, 93 L.Ed.2d 809 (1987).

*Felton v. Southeastern Pennsylvania Trans. Auth.,* 952 F.2d 59, 60 (3rd Cir. 1991). Thus, the threshold issue is whether, at the time that his injury occurred, Plaintiff was employed by a "common carrier by railroad" engaged in interstate commerce. *Id.*

■ The plaintiff has the burden of proving that the defendant is a common carrier and "therefore must present affirmative evidence indicating such." *Mickler v. Nimishillen and Tuscarawas Railway Co.,* 13 F.3d 184, 189 n. 3 (6th Cir.1993) ("We note that even if defendant were estopped from denying it was a common carrier, summary judgment would be proper. Plaintiff has the burden of proving defendant is a common carrier and therefore must present affirmative evidence indicating such. Because plaintiff has not presented any such evidence, his claim would fail even if defendant were estopped from presenting evidence that it is not a common carrier.")

■ A "common carrier by railroad" is defined as "one who operates a railroad as a means of carrying for the public,—that is to say, a railroad company acting as a common carrier." *Edwards v. Pacific Fruit Express Co.,* 390 U.S. 538, 540, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968).[6] A common carrier has also been defined as

one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is re-

garded in some respects as a public servant.

*Kieronski v. Wyandotte Terminal R.R.,* 806 F.2d 107, 108 (6th Cir.1986) (quoting *Kelly v. General Electric Co.,* 110 F.Supp. 4, 6 (E.D.Pa.), *aff'd,* 204 F.2d 692 (3rd Cir.), *cert. denied,* 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390 (1953)).

In *Lone Star Steel Company v. McGee,* 380 F.2d 640 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), the Fifth Circuit Court of Appeals identified factors that are relevant in determining whether a railroad is a common carrier:

First—actual performance of rail service, second-the service being performed is part of the total rail service contracted for by a member of the public, third—the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad and hence such entity is deemed to be holding itself out to the public, and fourth—remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

*Id.* at 647. The Sixth Circuit has held that the *Lone Star* factors should not be applied as a test, but only as *"considerations* for a court to keep in mind when determining whether a carrier is a 'common carrier.'" *Kieronski,* 806 F.2d at 108 (6th Cir. 1986) (emphasis in original). *See also Sullivan v. Scoular Grain Co. of Utah,* 930 F.2d 798 (10th Cir.1991) (Although the *Lone Star* criteria may provide guidance for the court, more emphasis should be

---

**6.** In *Pacific Fruit,* the Court discussed Congress' reluctance to broaden the scope of what constitutes a common carrier in its 1939 amendments to FELA. "By refusing to broaden the meaning of railroads, Congress de-

clined to extend the coverage of the Act to activities and facilities intimately associated with the business of common carrier by railroad." 390 U.S. at 54, 88 S.Ct. 697.

placed on the statutory interpretation of the Supreme Court in *Wells Fargo & Co. v. Taylor*,[7] 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920), and *Edwards v. Pacific Fruit Express Co.*, 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968)).

*Kieronski* approved of a categorical approach in determining when a railroad is a common carrier.

> Our review of the numerous cases determining when a carrier is a "common carrier" reveals that carriers can be divided into several categories. We believe that it is more helpful here to focus on the several categories than it is to apply the considerations of *Lone Star* as a "four-part test."
>
> The first category we see is that of in-plant facilities. Courts have long recognized that in-plant rail facilities are not common carriers, even where those facilities are quite extensive, and an in-plant system does not become a common carrier merely by being connected to a common-carrier, because such a connection is a common feature of in-plant systems.
>
> Another category of carriers that are not considered to be "common carriers," is that of private carriers. Private carriers haul for others, but only pursuant to individual contracts, entered into separately with each customer.
>
> A type of carrier that is invariably labelled a "common carrier" is a linking carrier. Where a rail entity links two or more common carriers, the linking entity has become a vital part of the common carrier system and, therefore, becomes a common carrier. This is true where there is common ownership between the linking carrier and a linked common carrier, or where the relationship is purely contractual.
>
> Finally, there is the category in which we find *Lone Star*. Lone Star looks initially like a typical in-plant operation, which would not be characterized as a "common carrier," except that Lone Star's operation did not end there. Lone Star also performed some of the functions of the common carrier, functions that the common carrier's customer had contracted to have the common carrier perform. Lone Star became, in effect, part of the common carrier by virtue of Lone Star's ownership of the common carrier, combined with Lone Star's performance of the common carrier's duties. Several of the "linking" cases cited above may also fit into this category.

806 F.2d at 108–09 (citations omitted).

> In *Kieronski*, the facts were as follows:
>
> Wyandotte was, at the time of Kieronski's injury, a wholly-owned subsidiary of BASF Wyandotte Corporation ("BASF"). Originally, Wyandotte's railroad line was on two parcels of property owned by BASF, and its operations were almost entirely concerned with in-plant switching for BASF. At one parcel, Wyandotte's tracks connected to and Wyandotte received cars from the Detroit, Toledo & Ironton Railroad. At

---

**7.** In *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920), the Supreme Court explained that a "common carrier by railroad" is

> one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier. This view not only is in accord with the ordinary acceptation of the words, but is enforced by the mention of cars, engines, track, roadbed and other property pertaining to a going railroad.

*Id.* at 187–88, 41 S.Ct. 93. Applying this definition, the Court held that an express company that neither owns or operates a railroad but uses and pays for rail transportation is not a common carrier within the scope of the Act. *Id.* at 188, 41 S.Ct. 93.

the other parcel, Wyandotte's tracks connected to and Wyandotte received cars from Consolidated Rail Corporation. Wyandotte also had trackage rights over a short stretch of track owned by the Detroit, Toledo & Ironton Railroad, so that it could travel between the two parcels of land to perform switching duties at both locations. BASF subsequently sold portions of its property to Diversey Wyandotte Corporation and to Du Pont Carbide. As a part of the purchase agreement, BASF arranged to have Wyandotte switch the purchasers' rail cars as well as those of BASF.

806 F.2d at 108. The court applied its categorical approach and determined that Wyandotte was an "in-plant system carrier."

Wyandotte argues that it was an in-plant system. We agree. Wyandotte's system connected to two common carriers, but in no way acted to "link" them or to perform functions for which the customers of the common carriers had contracted. Wyandotte merely connected the plants to the common carriers in a manner typical of in-plant systems. Our conclusion is not weakened by Wyandotte's right to use a portion of the track of the Detroit, Toledo & Ironton Railroad, a common carrier, because those rights were merely for the convenience of the plants and in no way furthered the contractual obligations of the common carrier. Similarly, our conclusion is not weakened by the fact that Wyandotte was, at the time of the injury, also servicing the facilities of Diversey Wyandotte Corporation and Du Pont Carbide. Those extensions of service did not go beyond what was originally BASF property; Wyandotte retained its essential character as an in-plant system; and Wyandotte did not provide services that the common carri-

er had contracted to perform. The system looks, at most, like a private carrier arrangement, with Wyandotte holding itself out solely to those businesses that owned facilities within the original two parcels, which does not lead us to characterize Wyandotte as a "common carrier."

*Id.* at 109–110 (citations omitted).

■ The facts in the present case mirror those in *Kieronski*. Defendant receives cars from two common carriers, CSX and West Tennessee, as did Wyandotte. Defendant operates exclusively on the in-plant facilities and track of American Ordinance at the Milan Army Ammunition Plant. Because its contract is with American Ordinance, Defendant does not provide any services for the public. Accordingly, as was the railroad in *Kieronski*, Defendant may be characterized as an in-plant carrier which is not a common carrier category.

Alternatively, Defendant is a private carrier. Private carriers, which haul for others pursuant to individual contracts entered into separately with each customer, are not considered common carriers. *Kieronski*, 806 F.2d at 108–109. That is, private carriers do not undertake to carry for all persons indiscriminately but transport only for those with whom they contract. *Kelly v. General Elec. Co.*, 110 F.Supp. 4 (E.D.Pa.), *aff'd*, 204 F.2d 692 (3rd Cir.), *cert. denied*, 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390 (1953).

In *Loveless v. Ry. Switching Serv., Inc.*, 106 Ohio App.3d 46, 665 N.E.2d 252 (1995), the court found that the defendant railroad, which was engaged in the business of performing in-plant rail switching services for company-clients at facilities of those clients pursuant to individually negotiated contracts, was not a "common carrier" subject to the FELA but, rather, was "a pri-

vate carrier ... more accurately described as an independent contractor performing in-plant rail operations for specific company-clients." The facts in *Loveless* were as follows:

RSS engages in the business of performing in-plant rail switching services for company-clients at the facilities of those clients. These services consist primarily of moving cars between "holding yards" and various points within a client's facilities for loading. After a client loads goods onto cars, RSS assembles "cuts" of outbound cars in the holding yards. Additionally, RSS performs limited maintenance on locomotives leased by RSS or its clients and on track within the clients' facilities. RSS engages in these activities pursuant to contracts individually negotiated with thirteen clients at seventeen locations in ten states. RSS owns no track, locomotives, or cars and earns ninety-eight percent of its revenue from the services described above. RSS advertises its services in order to secure more clients that require only in-plant rail switching services and do not require that RSS use track owned by full-service common carrier railroads.

*Id.* at 253 (footnotes omitted).

The court rejected Loveless' reliance on *Lone Star* in support of his argument that the defendant was a common carrier. *Id.* at 254.

Loveless correctly states in the first two criteria that (1) the entity in question must actually perform rail service, and (2) the service must be a part of the total rail service for which a member of the public contracts. Loveless states that under the third criterion an entity must hold "itself out as part of a system of interstate rail transportation * * *." However, the *Lone Star* court's definition of the third criterion is that "the

entity is performing as part of a system of interstate rail transportation *by virtue of a common ownership between itself and a railroad or by a contractual relationship with a railroad,* and hence such entity is deemed to be holding itself out to the public." (Emphasis added.) *Id.* at 647.

Loveless also omits a significant portion of the fourth criterion, which he states as receiving remuneration for the services performed. In the fourth criterion, the *Lone Star* court held that "remuneration for the services performed is received in some manner, such as a fixed charge *from a railroad* or by a percent of the profits *from a railroad.*" (Emphasis added.) *Id.*

The omitted passages clearly contemplate an affiliation between an in-plant operation and a full-service, common carrier railroad in order to confer the status of common carrier upon what would otherwise be an in-plant operation, which is outside the scope of FELA.

In *Lone Star,* the defendant produced steel and steel products and operated an in-plant rail system at its plant. Other industries also had operations on the plant grounds. A main line of the Texas & Northern Railway Company ("T & N"), a full-service common carrier railroad, extended the length of Lone Star's facility in conjunction with the in-plant system. Lone Star owned over ninety percent of the stock of T & N and received dividends on the profits. Lone Star also owned and operated locomotives at the plant for Lone Star's in-plant rail movements and for the other industries at the plant in furtherance of T & N's operations with those businesses. Because of these close connections between Lone Star and T & N, the court held that Lone Star's rail activities

exceeded the scope of the typical in-plant operation and met the four criteria to be classified as a common carrier. 665 N.E.2d at 254.

Looking at the categories described in *Kieronski*, the Ohio court noted that the "services provided by RSS mirror those of an in-plant system, except that RSS performs on a contract basis for individual plants, but not with any affiliation to full-service common carrier railroads." *Id.* at 255. The court then examined *Kieronski'*s "private carrier" category.

> Another type of rail service that does not fall within the scope of FELA is a private carrier. Private carriers haul goods for clients "pursuant to individual contracts, entered into separately with each customer." [*Kieronski*, 806 F.2d at 108].

> By contrast, a common carrier offers its transportation services to the public at large. "The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently and hence is regarded in some respects as a public servant." *Kieronski, supra,* 806 F.2d at 108, citing *Kelly v. Gen. Elec. Co.*, 110 F.Supp. 4, 6 (E.D.Pa.1953), *affirmed* 204 F.2d 692 (C.A.3, 1953), *certiorari denied* 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390 (1953).

> Here, RSS operates as a private carrier, because it performs its services on individual contracts entered into separately with each customer, rather than for the public at large. The "public servant" ingredient is totally lacking. Thus, RSS is best characterized as a private carrier operating an in-plant operation for the Ivorydale plant.

> Quite clearly, RSS is not a common carrier. RSS manages in-plant rail operations for its clients, operating solely on the property of individual clients pursuant to separately negotiated contracts.

RSS is not in any way affiliated with a full-service common carrier either contractually or by virtue of common ownership. Furthermore, RSS does not appear to transport people or property "from place to place" as required by FELA. Even Loveless concedes that RSS contracts exclusively for in-plant operations at its clients' facilities, and then only on the condition that the use of common-carrier tracks will not be necessary.

665 N.E.2d at 255.

Here, as in *Loveless*, Defendant parks and stores cars pursuant to individual contracts rather than for the public at large. Defendant does not transport people or property "from place to place." Thus, Defendant may be characterized as a private carrier operating an in-plant operation. Consequently, Defendant is not a common carrier for the purpose of FELA liability.

Also mitigating against Defendant's being defined as a common carrier is the fact that Plaintiff has presented no evidence that Defendant charges for the movement of rail cars. *See McCrea v. Harris County Houston Ship Channel Navigation Dist.*, 423 F.2d 605 (5th Cir.1970) (A factor in deciding whether a railroad is a common carrier is whether there is a direct charge for the movement of rail cars incident to unloading.) *Cf., Nichols v. Pabtex, Inc.*, 151 F.Supp.2d 772 (E.D.Tex.2001) (Genuine issues of material fact existed on whether Pabtex was a common carrier by rail under FELA because "Pabtex owns at least one locomotive, it shares railcars with KCSR, its employees perform rail services, and **it makes direct charges for the movement of rail.**" (emphasis added)).

Additionally, Plaintiff's reliance on the fact that Defendant withheld from Plaintiff's paychecks railroad retirement taxes and federal unemployment taxes and that the Railroad Retirement Board deter-

mined that Plaintiff was entitled to railroad unemployment benefits is misplaced. In *Mickler*, the plaintiff presented documents which showed "that plaintiff was covered by railroad retirement. They further indicate that defendant was licensed to operate as a common carrier, that products were shipped by Republic to other states and that employees of defendant worked outside Republic's yard." 13 F.3d at 187. The court found that these facts did not bring the defendant within the purview of FELA.

> These facts, assuming for summary judgment that they can be proved, do not create an issue of material fact for trial. The question is not whether defendant is licensed as a common carrier but whether defendant offers or provides common carrier services. Also, defendant may have acted under a mistaken belief that it was a common carrier and accordingly provided certain retirement benefits and submitted to federal inspections but it is not a common carrier unless it provided services for other common carriers or the public.

*Id.*

■ Plaintiff has cited no authority for its argument that, if Defendant is found to be a common carrier in one location (in this case, Arkansas), then it is a common carrier in all of its locations. Plaintiff's Response at p. 6. However, even if this is an accurate statement of the law, there is no evidence in the record that Defendant is a common carrier or holds itself out as a common carrier in Arkansas. Plaintiff has presented evidence of what purports to be an Internet web site for Defendant's Ar-

kansas facility. *See* Plaintiff's Exhibit 2. Plaintiff contends that the web site is an "advertisement" by Defendant for common carrier business. However, as attested to by Gene Hill, *see* Affidavit of Gene Hill, Exhibit to Defendant's Reply, the web site actually belongs to Union Pacific Railroad and, therefore, is not an advertisement by Defendant. Furthermore, both Plaintiff's Exhibit 1 which appears to be some kind of directory listing for the Arkansas facility and Plaintiff's Exhibit 2 are unauthenticated. Under Rule 56(e) of the Federal Rules of Civil Procedure, documentary evidence "must be sworn or certified." A party cannot rely on documents that are unsworn and unauthenticated. *Moore v. Holbrook*, 2 F.3d 697 (6th Cir.1993). Therefore, the court cannot consider these exhibits to refute Defendant's evidence that it is not a common carrier.[8]

Because Defendant has refuted Plaintiff's allegation that it is a common carrier by presenting evidence that it does not offer transportation services to the public at large and does not carry people indifferently or transport goods for the public at large and because Plaintiff has failed to offer evidence that would create a disputed issue of fact, the court finds that Defendant is not a common carrier within the meaning of FELA. Therefore, Defendant is entitled to judgment as a matter of law, and Defendant's motion for summary judgment is GRANTED. The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

8. Even if the court did consider the advertisement submitted by Plaintiff, the outcome of the case would not be affected. "Though Loveless makes much of RSS's advertising its services in trade publications, this is not a holding out as contemplated by *Lone Star, P & C Dock, Kieronski* or FELA. Service providers do not change status to common carriers based on advertisements unless they undertake to carry for all people indifferently." *Loveless v. Ry. Switching Serv., Inc.*, 106 Ohio App.3d 46, 665 N.E.2d 252, 255 (1995).